983 A.2d 1114 (2009)
410 N.J. Super. 549
STATE of New Jersey, Plaintiff-Respondent,
v.
Robert E. WILLIAMS a/k/a Robert Love, Defendant-Appellant.
DOCKET NO. A-4530-07T4.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 2009.
Decided November 23, 2009.
*1115 Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Aiello, of counsel and on the brief).
Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Mr. Yomtov, of counsel and on the brief).
Before Judges SKILLMAN, GILROY and SIMONELLI.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
The primary issue presented by this appeal is whether flight from an unconstitutional investigatory stop that could justify an arrest for obstruction automatically justifies the admission of any evidence revealed during the course of that flight. We conclude that such evidence is admissible only if there is a significant attenuation between the unconstitutional stop and the seizure of evidence and that commission of the offense of obstruction is insufficient by itself to establish significant attenuation.
On August 25, 2006, Officer Delaprida of the Elizabeth Police Department was dispatched together with thirteen to fifteen other officers to the courtyard of a large housing complex located in a high-crime *1116 area. Delaprida and the other officers were sent to the housing complex to deter, through a "police presence," a possible retaliatory shooting for a homicide committed several days earlier.
Officer Delaprida had no information concerning the basis for the report of a possible retaliatory shooting. Delaprida also had no description or other information concerning the person or persons who might be planning the shooting.
When Officer Delaprida arrived at the housing complex with his partner around 8:30 p.m., they observed a large number of people in the courtyard, including children and older people, "just hanging out." One of the persons the officers observed was defendant, who was riding a bicycle diagonally in front of them.
When defendant recognized the officers, who were dressed in plain clothes, as police, he quickly started pedaling away and also put his right hand in his pants pocket. The officers ordered defendant to stop, but he kept pedaling "at a steady pace," and the officers started to run after him. Defendant then saw other officers entering the courtyard from the direction he was headed and slowed down. At this point, Officer Delaprida and his partner caught up with defendant, and grabbed him while still on his bicycle. As the officers grabbed him, defendant pulled his hand out of his pocket and threw a box to the ground. The box was later determined to contain a substantial amount of cocaine. Officer Delaprida estimated that only four or five seconds elapsed between when he ordered defendant to stop and when he grabbed him on his bicycle.
Defendant was indicted for possession of cocaine, in violation of N.J.S.A. 2C:35-10(a)(1); possession of cocaine with the intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(2); and possession of cocaine within 500 feet of a public housing facility with the intent to distribute, in violation of N.J.S.A. 2C:35-7.1. Defendant subsequently moved to suppress the evidence against him.
Based on the previously described testimony by Officer Delaprida, the trial court concluded in a written opinion that the report of a possible retaliatory shooting and the observations by Officer Delaprida and his partner of defendant pedaling his bicycle away from them and putting his hand in a pocket did not provide the reasonable suspicion defendant was engaged in criminal activity required for a Terry stop.[1] Nevertheless, the court denied defendant's motion to suppress on the ground that defendant's failure to immediately stop his bicycle in response to Officer Delaprida's original command established probable cause to arrest him for obstruction, in violation of N.J.S.A. 2C:29-1(a), even though that command was unconstitutional, and that defendant's apparent violation of the obstruction statute provided sufficient grounds to justify the stop that resulted in him discarding the cocaine hidden in his pocket.
Defendant subsequently entered into a plea bargain under which he pled guilty to the charge of possession of cocaine, and the State dismissed the possession with intent to distribute charges. The trial court sentenced defendant to a four-year term of imprisonment, with two years of parole ineligibility.
Defendant appeals from the denial of his motion to suppress. See R. 3:5-7(d) (preserving right to appeal denial of motion to suppress notwithstanding guilty plea).

I.
We first consider the validity under the Fourth Amendment to the United States *1117 Constitution and Article I, paragraph 7 of the New Jersey Constitution of the stop of defendant while he was riding his bicycle in the housing complex courtyard.
A police encounter with a person constitutes an investigatory stop subject to the protections of these constitutional provisions if the facts objectively indicate that "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." State v. Tucker, 136 N.J. 158, 166, 642 A.2d 401 (1994) (quoting Florida v. Bostick, 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389, 402 (1991)). It is undisputed that defendant was subject to such a stop probably when Officer Delaprida ordered him to stop and certainly when Officer Delaprida and his partner grabbed him on his bicycle. See State v. Crawley, 187 N.J. 440, 450, 901 A.2d 924, cert. denied, 549 U.S. 1078, 127 S.Ct. 740, 166 L.Ed.2d 563 (2006); Tucker, supra, 136 N.J. at 165-66, 642 A.2d 401; State in Interest of C.B., 315 N.J.Super. 567, 572-73, 719 A.2d 206 (App.Div.1998).
"[A]n investigatory stop is valid `if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" State v. Williams, 192 N.J. 1, 9, 926 A.2d 340 (2007) (quoting State v. Pineiro, 181 N.J. 13, 20, 853 A.2d 887 (2004)). A suspicion of criminal activity will be found to be reasonable only if it is based on "some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity." Pineiro, supra, 181 N.J. at 22, 853 A.2d 887 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)). In making this determination, a court must consider "[t]he totality of the circumstances." Ibid.
It is firmly established in this State that "flight alone does not create reasonable suspicion for a stop[.]" State v. Dangerfield, 171 N.J. 446, 457, 795 A.2d 250 (2002); see Pineiro, supra, 181 N.J. at 26, 853 A.2d 887; Tucker, supra, 136 N.J. at 168-70, 642 A.2d 401. However, flight "in combination with other circumstances ... may support [the] reasonable and articulable suspicion" required to justify a stop. Pineiro, supra, 181 N.J. at 26, 853 A.2d 887; see State v. Citarella, 154 N.J. 272, 280-81, 712 A.2d 1096 (1998); State v. Ruiz, 286 N.J.Super. 155, 163, 668 A.2d 460 (App.Div.1995).
Applying these principles, the trial court correctly concluded that Officer Delaprida and his partner did not have a reasonable suspicion that defendant was engaged or about to engage in criminal activity. These police officers had been dispatched to the housing complex based on a report of a possible retaliatory shooting in the area. The State did not present any evidence regarding the source of the information upon which the report was based. Consequently, the record does not indicate whether the information came from a police officer, a confidential informant, or merely a rumor in the neighborhood. The report also did not include any specific information regarding where in the housing complex or when the shooting might occur, or who the possible perpetrator or perpetrators might be. In addition, the officers admittedly did not have any prior contact with defendant and thus had no reason to believe he might be involved in the possible retaliatory shooting or other criminal activity.
In these circumstances, the police had no reason to focus upon defendant as a possible perpetrator of the reported possible retaliatory shooting. Defendant did not, for example, match a description of a *1118 suspect, because the report did not include such a description, and there is nothing intrinsically suspicious about a person riding a bicycle in a housing complex courtyard at 8:30 p.m. Thus, defendant's conduct when the police first arrived at the scene was no more suspicious than that of the numerous other persons congregated in the courtyard.
Moreover, defendant's conduct after he saw the officers enter the courtyard did not provide an objectively reasonable basis for suspecting that he had engaged in or was about to engage in criminal activity. Defendant simply started quickly pedaling away from the officers and put his hand in his pocket. We question whether this conduct should even be considered flight because the officers did not initially indicate to defendant that he should stop. Defendant could have believed that he should simply get out of the officers' way. In any event, even if defendant's conduct in pedaling away from the officers could be viewed as flight once they ordered him to stop, as previously stated, "flight alone does not create [the] reasonable suspicion [required] for a stop[.]" Dangerfield, supra, 171 N.J. at 457, 795 A.2d 250.
The fact that defendant also put his hand in his pocket did not provide any additional foundation for an objectively reasonable suspicion that defendant had engaged or was about to engage in criminal activity. Putting a hand in a pocket is fairly common human conduct that does not generally involve the commission of a crime. Although Officer Delaprida testified that he had a "concern maybe [defendant] was trying to hide a weapon of some sort" in his pocket, he did not articulate any basis for this alleged concern, and since defendant was pedaling his bicycle in the opposite direction from the officers, the officers could not have had any reasonable concern for their own safety.
This case is similar to State v. L.F., 316 N.J. Super. 174, 719 A.2d 1272 (App.Div. 1998), in which the State argued that defendant's act of walking away when the police approached and also putting his hand in his pocket created the reasonable suspicion of criminal activity required for a Terry stop. In rejecting this argument, we observed that "the mere act of putting something from one's hand into one's own pocket while departing alone signifies nothing additional by way of reasonable suspicion." Id. at 179, 719 A.2d 1272. This observation is equally applicable to the present case.
The State argues that the dispatch of police officers to the housing complex to deter the commission of a retaliatory shooting constituted an exercise of the police department's community caretaking responsibilities and that the prerequisites for an investigatory stop should be applied less strictly in that circumstance. "The `community caretaker doctrine' ... applies when the `police are engaged in functions, [which are] totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a [criminal] statute.'" State v. Diloreto, 180 N.J. 264, 275, 850 A.2d 1226 (2004) (quoting State v. Cassidy, 179 N.J. 150, 161 n. 4, 843 A.2d 1132 (2004)). Examples of police community caretaking activities include "search[ing] for missing persons, ... mediat[ing] disputes, and ... aid[ing] the ill or injured[.]" Id. at 281, 850 A.2d 1226 (quoting Debra Livingston, Police, Police Community Caretaking, and the Fourth Amendment, 1998 U. Chi. Legal F. 261, 302 (1998)); see also State v. Bogan, 200 N.J. 61, 73-81, 975 A.2d 377 (2009).
We do not believe that the dispatch of police officers to an area to deter the commission of a crime constitutes an exercise of the police's community caretaking responsibilities. Indeed, the deterrence of *1119 criminal conduct is a significant component of much police work, including routine foot and car patrols. Thus, such police activity is not "totally divorced" from the detection, investigation and acquisition of evidence relating to criminal conduct. Diloreto, supra, 180 N.J. at 275, 850 A.2d 1226. Therefore, the expansion of the community caretaking doctrine to apply in circumstances where the police are undertaking to deter crime would significantly dilute the protections against unreasonable searches and seizures provided by the United States and New Jersey Constitutions.
For all these reasons, the trial court correctly concluded that Officer Delaprida and his partner did not have the reasonable suspicion of criminal activity required to stop defendant.

II.
We now consider the trial court's ruling that even though the initial stop of defendant was unconstitutional, defendant's failure to comply with Officer Delaprida's command to stop constituted obstruction, which provided the probable cause required to justify defendant's arrest and justified admission of the evidence of the cocaine defendant discarded when the police apprehended him. This requires a review of the Supreme Court's recent decisions in Crawley, supra, 187 N.J. 440, 901 A.2d 924, and Williams, supra, 192 N.J. 1, 926 A.2d 340. In Crawley, the Court held that a person who flees from an investigatory stop may be convicted of obstruction under N.J.S.A. 2C:29-1 even though the stop is later found to have been unconstitutional if the police officer making the stop was "acting in objective good faith, under color of law in the execution of his duties." 187 N.J. at 460-61, 901 A.2d 924. In Williams, the Court held that evidence the police obtained in apprehending a person who has obstructed an unconstitutional investigatory stop may be admissible if the evidence is "sufficiently attenuated from the taint" of the unconstitutional stop. 192 N.J. at 15, 926 A.2d 340.
Defendant argues that his failure to immediately stop his bicycle in response to Officer Delaprida's command could not be found to constitute obstruction within the intent of N.J.S.A. 2C:29-1(a) as interpreted in Crawley. We have no need to address this argument because we conclude that even if defendant's failure to obey Officer Delaprida's command to stop would have provided an adequate basis to arrest him for obstruction, the evidence obtained when Officer Delaprida and his partner grabbed defendant was not "sufficiently attenuated" from the taint of the unconstitutional stop to justify its admission into evidence.
The Court in Williams held that the determination of whether the police "have obtained the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct" requires consideration of three factors: "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." 192 N.J. at 15, 926 A.2d 340 (quoting State v. Johnson, 118 N.J. 639, 653, 573 A.2d 909 (1990)).
In Williams, the defendant responded to a police command that he place his hands on his head to enable the officers to pat him down by pushing one of the officers and fleeing from the scene. Id. at 5, 926 A.2d 340. When the police caught the defendant, he was found with a handgun in his possession. Ibid. The Court concluded that the most significant factor in determining the admissibility of the handgun was "the presence of intervening circumstances," id. at 16, 926 A.2d 340, specifically *1120 defendant's pushing of one of the officers involved in the stop and fleeing from the scene, thus requiring the officers to engage in a police pursuit. Id. at 18, 926 A.2d 340. Based primarily on this factor, the Court concluded that the seizure of a handgun from the defendant following his obstruction of an unconstitutional investigatory stop was sufficiently attenuated from the stop to support admission of the evidence. Id. at 15-18, 926 A.2d 340.
The State argues that any flight or other conduct by a person subject to an unconstitutional stop that would provide a basis to arrest for obstruction also automatically requires denial of a motion to suppress any evidence obtained as a result of that person's apprehension, unless there is a showing of bad faith on the part of the police. However, as pointed out in the leading treatise in the field of search and seizure law, the question whether a person may be prosecuted for a new crime committed in response to an unconstitutional stop or other police misconduct is a different question than "whether an arrest for the new crime should be deemed so substantially 'purified' by that new crime as to provide a lawful basis for admitting evidence of some other offense ... found in a search incident to that arrest." 6 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 11.4(j), at 66 (4th ed. Supp. 2009).
Consistent with this view, our Supreme Court in Williams did not say that any conduct that could be found to constitute obstruction automatically constitutes "an intervening act ... that completely purge[s] the taint from the unconstitutional investigatory stop." 192 N.J. at 18, 926 A.2d 340. Instead, the Court indicated that the determination "whether evidence is sufficiently attenuated from the taint of a constitutional violation" must be made on a case-by-case basis in light of the three-factor test set forth in Johnson, supra, 118 N.J. 639, 573 A.2d 909, and reaffirmed in Williams, 192 N.J. at 15, 926 A.2d 340.
In concluding that the recovery of the handgun at the end of the police pursuit in Williams was sufficiently attenuated from the taint of the unconstitutional stop to justify the admission of that evidence, the Court pointed to State v. Seymour, 289 N.J.Super. 80, 672 A.2d 1273 (App.Div. 1996) and State v. Casimono, 250 N.J.Super. 173, 593 A.2d 827 (App.Div.1991), certif. denied, 127 N.J. 558, 606 A.2d 370, cert. denied, 504 U.S. 924, 112 S.Ct. 1978, 118 L.Ed.2d 577 (1992), as other examples of cases in which the taint of unlawful police conduct had sufficiently dissipated as a result of intervening criminal acts to justify admission of evidence recovered after the defendant's apprehension. Id. at 16, 926 A.2d 340. Therefore, it is illuminating to consider the factual circumstances that this court found to establish a sufficient attenuation between an unconstitutional stop and subsequent seizure of evidence to justify admission of that evidence in those cases.
In Seymour, the defendant disobeyed a police signal to stop his car, which resulted in a mile and a quarter police pursuit during which defendant increased his speed from forty to fifty miles per hour and swerved onto the shoulder of the road several times. 289 N.J.Super. at 83-85, 672 A.2d 1273. In the course of this police pursuit, the defendant discarded cocaine out the window of his car. Id. at 83, 672 A.2d 1273. Although the court assumed that the initial police signal to defendant to stop his car was unlawful, id. at 84, 672 A.2d 1273, it nevertheless concluded that defendant's failure to comply with that command constituted eluding, in violation of N.J.S.A. 2C:29-2(b), id. at 85, 672 A.2d 1273, and affirmed the denial of the defendant's motion to suppress evidence of the *1121 cocaine discarded during the course of the police pursuit. Id. at 86-89, 672 A.2d 1273. In reaching this conclusion, the court observed: "Fleeing from the police in a motor vehicle with the police in vehicular pursuit could endanger defendant, the officer, other motorist, or pedestrians." Id. at 87, 672 A.2d 1273.
In Casimono, the police directed a car to pull over to the shoulder of the road because the driver had made several lane changes without signaling. 250 N.J.Super. at 177, 593 A.2d 827. As the car pulled over, the police observed the defendant, who was a passenger, make a "furtive" movement. Ibid. Based on this observation, the police subjected both the driver and the defendant to pat down searches. Id. at 178, 593 A.2d 827. The driver resisted the search, first refusing to take his hand out of his pocket and then throwing something over the guardrail located along the shoulder of the roadway, which was subsequently determined to be a dollar bill containing cocaine residue. Ibid. At this point, defendant returned to the car where he retrieved a paper bag, which was subsequently determined to contain a substantial amount of cocaine, and also threw it over the guardrail. Ibid. The defendant and the driver then had to be physically subdued. Ibid.
We concluded that even though the stop of the car in which defendant had been riding was lawful, the pat down searches of the driver and the defendant had been unlawful. Id. at 178-82, 593 A.2d 827. Applying the three-factor test adopted in Johnson and later reaffirmed in Williams, we held that evidence of the cocaine in the dollar bill should have been suppressed because the driver "threw [the] dollar bill containing cocaine residue over the guardrail during and in direct response to the illegal pat down search[.]" Id. at 186, 593 A.2d 827. On the other hand, we held that the trial court had properly denied the motion to suppress the cocaine contained in the paper bag because the unlawful pat down search of defendant had been completed before he voluntarily returned to the car, in violation of the police officer's directions, and retrieved the paper bag that he threw over the guardrail. Ibid. We noted that the only unlawful police conduct was the pat down searches of the defendant and the driver, that the bag of cocaine was not located on their persons but rather in the car, and that defendant had gained access to the bag only by disobeying a lawful police order to remain outside the car. Id. at 186-87, 593 A.2d 827. Under these circumstances, we concluded that "there was a significant break in the chain of causation between the illegal searches and the discovery of the cocaine." Id. at 187, 593 A.2d 827.
Under the three-factor test for determining significant attenuation between unlawful police conduct and seizure of evidence reaffirmed in Williams, we perceive no basis for concluding that the unconstitutional stop of defendant constituted "flagran[t]... police misconduct." Williams, supra, 192 N.J. at 15, 926 A.2d 340 (quoting Johnson, supra, 118 N.J. at 653, 573 A.2d 909). However, the other Williams factors militate against the conclusion that there was a significant attenuation between the stop and the seizure of the cocaine discarded by defendant. Only four or five seconds elapsed between when Officer Delaprida directed defendant to stop his bicycle and defendant discarded the cocaine. Consequently, there was a very close "temporal proximity between the illegal conduct and the [recovery of] the challenged evidence[.]" Ibid. (quoting Johnson, supra, 118 N.J. at 653, 573 A.2d 909).
Most importantly, there were no significant "intervening circumstances" between the unlawful police command to defendant *1122 to stop his bicycle and defendant's discard of the box that resulted in the seizure of cocaine. Ibid. Defendant did not push a police officer, as in Williams, flee in a car resulting in a mile and a quarter police pursuit, as in Seymour, or seek to avoid apprehension by returning to a lawfully stopped car after the police had removed him from the car, as in Casimono. In those cases the defendant's intervening criminal acts not only constituted a break in the chain of causation between the unlawful police conduct and seizure of evidence but also posed a risk of physical injury to police officers and, at least in Seymour, members of the public. In contrast, defendant did not force the officers to engage in a lengthy and dangerous pursuit to apprehend him or engage in any act of physical aggression against Officer Delaprida and his partner. In fact, the officers physically accosted defendant by grabbing him on his bicycle. Therefore, there is no basis for concluding that the police seized the cocaine discarded by defendant "by means that [were] sufficiently independent to dissipate the taint of their [prior] illegal conduct." Williams, supra, 192 N.J. at 15, 926 A.2d 340 (quoting Johnson, supra, 118 N.J. at 653, 573 A.2d 909).
"The purpose of the exclusionary rule is to deter police misconduct and to preserve the integrity of the courts." Johnson, supra, 118 N.J. at 651, 573 A.2d 909. The attenuation exception applied in Williams, Seymour and Casimono was established in recognition of the fact that the seizure of evidence following police misconduct is in some circumstances so "far removed from the constitutional breach" that suppression "is a cost [that is] not justified" by the purposes of the exclusionary rule. State v. Badessa, 185 N.J. 303, 311, 885 A.2d 430 (2005). However, it is equally true that an overly expansive application of the attenuation exception can undermine the salutary objectives of the exclusionary rule. In New Jersey, the three-factor test reaffirmed in Williams delineates the circumstances in which the attenuation exception may be properly applied. Under those factors, the State failed to establish a "significant attenuation" between the unconstitutional stop of defendant and the seizure of the drugs he discarded following that stop.
Accordingly, the order denying defendant's motion to suppress is reversed and the judgment of conviction is vacated.
NOTES
[1] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).