**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0137-19T4

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

DONOVAN M. MANGUM,

      Defendant-Respondent.

_____

Submitted February 25, 2020 – Decided April 7, 2020

Before Judges Hoffman and Firko.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 18-08-2090.

Jill S. Mayer, Acting Camden County Prosecutor, attorney for appellant (Jason Magid, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Stephen Rogers Piper, attorney for respondent.

PER CURIAM

By leave granted, the State appeals from the July 30, 2019 Law Division order granting defendant's motion to suppress a handgun. We affirm.

I.

We derive the following facts from the June 12, 2019 hearing on defendant's motion to suppress. At the hearing, the State presented the testimony of two witnesses, Detective Baruch Zepeda, a member of the Fugitive Task Force of the United States Marshall Service, and Detective Prince Reed, a member of the Shooting Response Team (SRT) of the Camden County Metro Police Department.

On the evening of July 2, 2018, members of the Fugitive Task Force were canvassing streets in Camden looking for five fugitives with outstanding warrants. At the same time, SRT members, including Detective Prince Reed, were also working in the area and received a "Wanted" flier, which included photos of the five fugitives.

According to Detective Reed, at about 8:30 p.m., he was in the area of Third Avenue and Stevens Street, when he came upon defendant, one of the fugitives whose photo appeared in the flier. He described defendant as a "bald male, dark skin, and clean shaven."

Detective Reed recounted that defendant was "carrying a book bag and had an open container of an alcoholic beverage." Defendant was holding this container in a paper bag; however, Detective Reed said the bag was partially rolled down, allowing him to see enough of it that "it was very apparent that it was an alcoholic beverage . . . " He believed it was a twenty-four ounce beer can, which he called "a tall boy." He added that the open container "was one of the reasons for stopping" defendant.

Upon making these observations, Detective Reed exited his unmarked vehicle, wearing a visible badge on his hip and a vest with police identifiers on the front, intending to make a pedestrian stop. At this point, defendant dropped the beer can and fled. Detective Reed and another detective chased after him. They announced their pursuit on their police radios, and Detective Zepeda responded.

Defendant ran down an alley, where the detectives observed him throw his backpack over a fence and into a residential yard. The other detective remained with the backpack while Detective Reed continued to give chase. Detective Reed eventually caught up with defendant and apprehended him; in a search incident to arrest, he found a "jar of marijuana[.]"

The homeowners adjacent to the alley consented to police retrieving the backpack from their rear yard and confirmed the backpack did not belong to them. A search of the backpack revealed a silver Ruger Mark IV .22 LR handgun. The gun contained nine ball rounds in the magazine. Upon further investigation, the handgun was reported stolen.

Detective Zepeda subsequently prepared a report of defendant's arrest; however, the report did not include any reference to Detective Reed's identification of defendant as one of the five individuals from the wanted fliers. Detective Reed did not prepare a report of the encounter or arrest. Additionally, the police never recovered the beer can defendant allegedly dropped. On cross-examination, Detective Reed agreed that if he "had not seen a match with the fugitive sheet," he would not "have jumped out of [his] vehicle for somebody who just had a beer in their hand."

On July 2, 2018, a grand jury charged defendant with second-degree unlawful possession of a weapon, pursuant to N.J.S.A. 2C:39-5(b)(1) (count one), and third-degree receiving stolen property, pursuant to N.J.S.A. 2C:20-7 (count two).

On July 26, 2019, the motion judge delivered an oral opinion granting defendant's motion to suppress the handgun. The judge ruled the State failed

to establish that Detective Reed had an "objectively reasonable basis to believe that defendant was wanted as a fugitive or was engaged in criminal behavior" to make an investigatory stop. The judge found both Detective Reed and Detective Zepeda credible but relied on State v. Elders, 192 N.J. 224, 247 (2007), and concluded the State failed to present evidence to support Detective Reed's objective belief that the stop was justified based on him identifying defendant as one of the targeted fugitives. The judge noted the State did not introduce the wanted flier into evidence, and Detective Zepeda's report did not document Detective Reed's observations. Without any supporting testimony or evidence, the judge concluded that Detective Reed's identification of defendant as "bald male, dark skin, and clean shaven" was an insufficient basis to initiate an investigatory stop.

Accordingly, the motion judge concluded the State "presented no evidence that the defendant was otherwise reasonably suspected of being engaged in criminal behavior[,]" pointing to Detective Reed's acknowledgment that he would not "have jumped out of [his] vehicle for somebody who just had a beer in their hand."

The judge then considered whether the State established a significant attenuation between the stop and the seizure of the gun and addressed the three

5

factors set forth in State v. Williams, 410 N.J. Super. 549 (App. Div. 2009). The judge focused on the second factor and concluded "the State has not established that the intervening circumstances of the defendant's discarding of the evidence amounts to significant attenuation." The judge found defendant's abandonment of his backpack immaterial because Williams did not address abandonment when discussing attenuation.

On August 16, 2019, we granted the State's motion for leave to appeal the order granting defendant's suppression motion.

## II.

We review the trial court's findings of fact on a motion to suppress deferentially, affirming whenever they are supported by sufficient credible evidence in the record. Elders, 192 N.J. at 243. We particularly defer to those findings that flow from the trial court's opportunity to see and hear the witnesses, an opportunity not enjoyed by a reviewing court. State v. Johnson, 42 N.J. 146, 161 (1964); see also State v. Diaz-Bridges, 208 N.J. 544, 565 (2012). Appellate courts should reverse only when the trial court's determination "is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction." Johnson, 42 N.J. at 162. "A trial court's interpretation of the law, however, and the consequences

6

that flow from established facts are not entitled to any special deference," and its "legal conclusions are reviewed de novo." Ibid.

It is the State's burden to establish by a preponderance of the evidence that the challenged stop and seizure falls within an exception to the Fourth Amendment's warrant requirement. Elders, 192 N.J. at 246. One such exception is the investigatory or Terry[1]-type stop, in which specific and articulable facts, along with rational inferences, give rise to a reasonable and articulable suspicion of criminal activity. State v. Pineiro, 181 N.J. 13, 20 (2004). The test is objective, the question being whether at the moment of seizure, the officer had at his command sufficient facts supporting a person of reasonable caution in the belief that a seizure was appropriate. Id. at 21-22. The analysis must be fact-sensitive, each case must be carefully reviewed, and an individual determination made. Id. at 22. The totality of the circumstances must satisfy the reasonable and articulable standard. Elders, 192 N.J. at 247.

On appeal, the State argues the judge erred when he concluded the State failed to establish that Detective Reed had reasonable suspicion to conduct an investigatory stop based upon his belief that defendant was violating a local ordinance proscribing public consumption of alcoholic beverages. The State

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

A-0137-19T4

further argues the judge erroneously focused on Detective Reed's testimony that he stopped defendant based on his determination that defendant was one of the five individuals depicted in the photos contained on the wanted flier.

"A police officer may conduct an investigatory stop of a person if that officer has 'particularized suspicion based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing.'" State v. Coles, 218 N.J. 322, 343 (2014) (quoting State v. Davis, 104 N.J. 490, 504 (1986)). "The stop must be reasonable and justified by articulable facts; it may not be based on arbitrary police practices, the officer's subjective good faith, or a mere hunch." Ibid. Law enforcement officers are justified in conducting an investigatory stop when they have a reasonable and articulable suspicion of criminal activity. Pineiro, 181 N.J. at 20. As the Court has explained,

> An investigatory stop is valid only if the officer has a 'particularized suspicion' based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing. The "articulable reasons" or "particularized suspicion" of criminal activity must be based upon the law enforcement officer's assessment of the totality of the circumstances with which he is faced. Such observations are those that, in view of officer's experience and knowledge, taken together with rational inferences drawn from those facts, reasonably

> warrant the limited intrusion upon the individual's freedom.
>
> [Davis, 104 N.J. at 504 (citations omitted).]

The reasonable suspicion standard requires "some minimal level of objective justification for making the stop." State v. Nishina, 175 N.J. 502, 511 (2003). "Its application is highly fact sensitive and, therefore, not readily, or even usefully, reduced to a neat set of legal rules." Ibid. (citations omitted). Facts that seem innocent in isolation "can sustain a finding of reasonable suspicion when considered in the aggregate, so long as the officer maintains an objectively reasonable belief that the collective circumstances are consistent with criminal conduct." Ibid. (citation omitted). "An officer's experience and knowledge are factors courts should consider in applying the totality of the circumstances test." Pineiro, 181 N.J. at 22. "Neither inarticulate hunches nor an arresting officer's subjective good faith can justify an infringement of a citizen's constitutionally guaranteed rights." Id. at 21 (citation omitted). An officer must clearly explain exactly what behavior led him to believe a defendant was engaged in criminal conduct. State v. Thomas, 110 N.J. 673, 678 (1988) (requiring that officers be able to point to "specific and articulable facts.").

A-0137-19T4

In <u>Nishina</u>, an experienced police officer stopped the defendant and his three companions on the grounds of an elementary school at approximately 10:00 p.m. 175 N.J. at 506. The officer testified that it was very unusual to see individuals at the school at that time because school was not in session and a local ordinance proscribed their presence after dark. <u>Ibid.</u> Also, although the school had a parking lot, defendant's car was parked across the street, some distance from the school. <u>Ibid.</u>

The officer requested the defendant's driver's license, registration and insurance card. <u>Id.</u> at 507. While receiving these documents, he smelled a strong odor of marijuana emanating from the defendant's clothes. <u>Id.</u> at 508. Thus, he patted down the defendant, discovering a pen and a pack of rolling papers that he believed were drug paraphernalia. <u>Ibid.</u> The officer then searched the defendant's car and found marijuana. <u>Id.</u> at 508-09. The officer admitted the school was not located in a high crime area, but the police were watching the school because of bomb threats made to other schools. <u>Id.</u> at 508. The defendant was convicted of possession of a controlled dangerous substance. <u>Id.</u> at 509. On appeal, defendant argued there was no constitutional basis for the stop. <u>Id.</u> at 509-10.

Our Supreme Court found the officer reasonably suspected that the defendant had been engaged or was about to engage in criminal activity, stating,

> First, the encounter took place at about ten o'clock on a Sunday night when the school clearly was closed. That fact created a duty for [the officer] to investigate the presence of defendant and his three companions, especially in view of the Colts Neck ordinance mandating that "[n]o person may, in any manner, enter upon, remain on or use the school grounds at times other than those designated[.]"
>
> Second, defendant explained to the officer that he and his friends had driven to the school because they had heard of its playground. Given the time of evening, defendant's mature age, and the officer's testimony that the playground consisted of a swing set "for the kids to play on," defendant's explanation was highly questionable, if not inherently unreliable. . . . The time of day and physical location at which a police-citizen encounter takes place are relevant to the analysis.
>
> [Id. at 512 (citations omitted).]

The Court noted that "[a]lthough when viewed in isolation some of the facts might support an innocent interpretation of events, collectively they formed a minimal level of objective justification for the officer's conduct." Id. at 513 (citation omitted).

11

While <u>Nishina</u> held that an observed violation of an ordinance is sufficient criminal activity to create a reasonable suspicion to initiate an investigatory stop, the Court also required other objective facts beyond an ordinance violation to support the officer's reasonable suspicion. <u>Id.</u> at 512. Here, the State failed to present any corroborating evidence that defendant violated the public drinking ordinance. Detective Reed did not testify he observed defendant drinking alcohol in public nor did he provide an explanation for his belief that defendant was holding an "open container." In addition, the State did not introduce the can defendant discarded. Lacking this evidence, the stop was not supported by any corroborating evidence or testimony. The State failed to establish the necessary reasonable and articulable suspicion to justify the stop under review. <u>Davis</u>, 104 N.J. at 504. We discern no basis to disturb the order under review.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0137-19T4